IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Estate of Q.W. *et al.*,                                                Case No. 3:22-CV-00671-JGC

                    Plaintiffs,

         v.                                                          **ORDER**

Lucas County Children Services *et al.*,

                    Defendants.


        This is a § 1983 civil rights and wrongful death case following the tragic death of an

infant boy. Plaintiffs Jamie Redmond and Quenton Whitsell are the parents of the decedent,

Q.C.W.[1] Plaintiffs bring this action against Lucas County Children Services ("LCCS") and its

employees, including Robin Reese, Katrina Jones, Nicholas Good, Danielle Stroble, Donna

Brown, Laura Rubley, and unknown Doe Defendants One through Five. Plaintiffs have also sued

Rochelle Nix, Decedent's foster parent, along with Dana Mikonowicz, a day care operator.

        The Complaint contains several claims, all arising from LCCS's removing Q.C.W. from

his parents' custody and Q.C.W.'s subsequent death while attending Mikonowicz's day care.

These claims include (1) Fourteenth Amendment procedural due process violations; (2)

violations of the Ohio Constitution; (3) Fourteenth Amendment substantive due process

violations; (4) violations of Ohio statutory duties for child services agencies; (5) wrongful death;

(6) survival; (7) negligent hiring, supervision, or retention; (8) bad faith; and (9) willful conduct.

---

[1] While the case caption refers to the decedent as "Q.W.," the parties' briefs add his middle
initial. I will do the same.

Pending are LCCS's and Rochelle Nix's respective Motions for Judgment on the Pleadings. (Docs. 10, 13). Plaintiffs have submitted an omnibus response in opposition. (Doc. 17). Defendants have submitted separate reply briefs. (Docs. 19, 20).

For the reasons below, I grant both Motions.

## Background

Plaintiff Redmond gave birth on November 15, 2019 to her second son, Q.C.W. (Doc. 1, ¶ 39). At the time, Redmond was living in a domestic violence shelter because she was a recent domestic abuse victim. (*Id.* ¶¶ 35–38). Redmond planned to bring Q.C.W. home with her from the hospital to live in the domestic violence shelter. (*Id.* ¶¶ 40–42).

Shortly after Q.C.W.'s birth, Defendant LCCS employee Katrina Jones informed Redmond that it was against LCCS policy for a parent to take custody of a child while residing at a domestic violence shelter (*Id.* ¶ 43). Jones further advised Redmond that LCCS could not place Q.C.W. in the custody of his father, Plaintiff Whitsell, due to Whitsell's criminal record. (*Id.* ¶ 47).

### 1. Custody Proceedings in the Ohio Court of Common Pleas

On November 20, 2019, the Lucas County Court of Common Pleas held an *ex parte* shelter care hearing before a magistrate. (Doc. 9-2, pgID 212). Plaintiffs Redmond and Whitsell did not attend. Plaintiffs allege that LCCS failed to give them notice of this hearing. (Doc. 1, ¶ 49).

At the hearing, counsel for LCCS told the court that Redmond had a current open case with LCCS regarding the safety and custody of her first son, where Redmond had "not yet progressed in services enough for the child to remain in her care . . . ." (Doc. 9-2, pgID 212).

LCCS also told the court about Whitsell's criminal history and the history of domestic violence between him and Redmond.

The court found:

1. "that there are reasonable grounds to believe that the child[] is/are in immediate danger and the removal from the home is needed to prevent immediate or threatened physical or emotional harm[;]"

2. "that LCCS has . . . made Reasonable Efforts to prevent the placement and removal of the child[][ from the home and/or make it possible for the child[] to remain in the home[;]"

3. that "continued residence of the child[] in or return to the home would be contrary to the child['s best interest and welfare[;]" and

4. "that reasonable grounds have been made to notify the parent(s) . . . that the child[] may be placed in shelter care and the reasons for placing the child[] in shelter care."

(*Id.*). The magistrate then ordered LCCS to take Q.C.W. "into shelter care custody at once." (*Id.*).

Shortly after, LCCS placed Q.C.W. in the custody of a licensed foster parent, Defendant Rochelle Nix, as ordered by the court. (*See id.*, pgID 208). LCCS entered into a foster care agreement with Nix on November 20, 2019. (*Id.*, pgID 222). An LCCS case worker and a supervisor also approved an alternative care agreement with Nix on November 25, 2019. The alternative care agreement allowed Nix to take Q.C.W. to Defendant Mikonowicz's day care on weekdays while Nix was presumably working. (*Id.*, pgID 225).

On November 20, 2019, within 24 hours of the *ex parte* hearing, the same magistrate held a *contested* shelter care hearing. (*See id.*, pgID 216). Plaintiff Redmond was not present, but her appointed counsel was. (*Id.*). Plaintiff Whitsell was present and represented by counsel. (*Id.*). A *guardian ad litem* represented Q.C.W.'s interests. (*Id.*) The court reiterated its findings from the day prior and awarded temporary interim custody of Q.C.W. to LCCS, pending a final

adjudication and disposition. (*Id.*). The court also ordered supervised visitation by Plaintiffs. (*Id.*, pgID 217).

A subsequent hearing for adjudication and disposition occurred on February 19, 2020. (*Id.*, pgID 213). Both Plaintiffs Redmond and Whitsell attended this hearing. (*Id.*). The magistrate explained Plaintiffs rights to them; the Plaintiffs waived them and consented to a finding of "dependency" for Q.C.W. (*Id.*). Plaintiffs also stipulated to the complaint filed by LCCS. (*Id.*). The court then decided that it was in the best interest of Q.C.W. to remain in the temporary custody of LCCS. (*Id.*)

A judge reviewed and adopted the magistrate's decision in a judgement entry. (Doc. 9-2, pgID 219). The judge also set subsequent review hearings for May and November 2020. (*Id.*, pgID 220).

### 2. Day Care Incidents

On February 21, 2020, Defendant Mikonowicz and Q.C.W. were in an auto accident. (Doc. 1 ¶ 77). Mikonowicz was driving, and Q.C.W. was in a rear-facing car seat in the back seat. (Doc. 17-7, pgID 624). The Toledo Fire Department reported to the scene, but Mikonowicz said she would go to the hospital on her own to have Q.C.W. treated for possible injuries. (Doc. 1, ¶ 94). She did not do so and instead took Q.C.W. to her day care. (*Id.* ¶ 84).

Defendant Nix took Q.C.W. to the emergency room the next day, on February 22, 2020, at LCCS's request. (Doc. 9-3, pgID 277–78). The examining nurse practitioner noted that Q.C.W. did not have any cuts or bruises and that he was alert, oriented, and responding appropriately. (*Id.*, pgID 278–79). The nurse discharged Q.C.W. about 25 minutes after his arrival and instructed Nix to schedule a follow-up with Q.C.W.'s doctor for the following week.

(*Id.*, pgID 279–80). Nix did not schedule this appointment until several weeks later. (Doc. 1, ¶ 106).

On March 19, 2020, Q.C.W. died while left in a baby swing at Mikonowicz's day care. (Doc. 1, ¶ 126).

The coroner's office performed an autopsy the next day, concluding that Q.C.W.'s cause of death was Sudden Unexpected Infant Death ("SUID"). (Doc. 9-4, pgID 287). The examining forensic pathologist also noted there was no evidence of abuse or neglect. (*Id.*, pgID 288).

The Ohio Department of Job and Family Services ("ODJFS") also investigated the incident the next day. (Doc. 1, ¶ 134; Doc. 17-9, pgID 634). ODJFS's report recommended suspension of Mikonowicz's childcare license because Q.C.W. died while in her custody and her day care program created a serious safety risk. (Doc. 1, ¶ 135–36; Doc. 17-9, pgID 634).

## Legal Standard

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).

In addition to the pleadings, courts may consider any documents referenced in the complaint that are central to the dispute. *United Food & Com. Workers, Loc. 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

While I apply federal pleadings standards, I apply Ohio state law when analyzing the substantive state-law issues raised by the parties. *See Penton Media, Inc. v. Affiliated FM Ins. Co.*, 245 F. App'x 495, 499 (6th Cir. 2007).

The same pleadings standard applies to a Rule 12(c) motion as to a Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted. *E.g., Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020). Thus, I evaluate a Rule 12(c) motion under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *Bates, supra*, 958 F.3d at 480.

"To survive a Rule 12(c) motion, the 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017) (quoting *Iqbal, supra*, 556 U.S. at 678) (internal quotation marks omitted). I construe the complaint "in the light most favorable to the plaintiff[s]," and all reasonable inferences are drawn in their favor. *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017).

Detailed factual allegations are not required under Rule 8(a) ("A pleading . . . must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]"), but the complaint must create more than a "*suspicion* of a legally cognizable right of action. . . ." *El-Hallani v. Huntington Nat. Bank*, 623 F. App'x 730, 734 (6th Cir. 2015).

"Mere labels and conclusions are not enough; the allegations must contain factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Engler, supra*, 862 F.3d at 575 (internal quotation marks omitted). In other words, the allegations must move the needle from "possible and conceivable" to "plausible and cognizable." *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022).

## Discussion

As an initial matter, Defendants attached multiple exhibits to their responsive pleading. (Doc. 9). "[W]hen a document is referred to in the pleadings and is integral to the claims, it may

6

be considered without converting a motion to dismiss into one for summary judgment. "*Com. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007).

I consider the February 21, 2020 traffic crash report (Doc. 17-7), the February 22, 2020 medical record (Doc. 9-3, pgID 271–81), and the coroner's report (Doc. 9-4). Each are mentioned in and integral to Plaintiffs' Complaint. I take judicial notice of the juvenile court orders (Doc. 9-2). *See Hancock v. Miller*, 852 F. App'x 914, 920 (6th Cir. 2021).

I decline to consider the other exhibits submitted by Defendants at the motion to dismiss stage. *See McLaughlin v. CNX Gas Co., LLC*, 639 F. App'x 296, 298 (6th Cir. 2016) ("We may also consider documents that a defendant attaches to a motion if the documents are referred to *in the plaintiff's complaint* and are central to her claims without converting the motion to one for summary judgment.") (emphasis added) (internal quotation marks omitted).

For this discussion and analysis, I group the Plaintiffs' claims into five categories: (1) § 1983 claims against Rochelle Nix; (2) § 1983 claims against LCCS for procedural due process violations; (3) § 1983 claims against LCCS for substantive due process violations; (4) Ohio constitution and statute violations; and (5) Ohio tort claims for wrongful death and survival.[2]

### 1.  § 1983 Claims against Rochelle Nix

Plaintiffs have not sufficiently alleged that Defendant Nix is a state actor liable under § 1983. *West v. Atkins*, 487 U.S. 42, 49 (1988) ("To state a claim under § 1983, a plaintiff . . .

---

[2] Count VIII of the Complaint is a bad faith claim against LCCS. (Doc. 1, 286–90). Good faith, and its inversion, are contract concepts typically litigated in claims by an insured against their insurer. *See Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 399 (Ohio 1994) ("A cause of action arises for the tort of bad faith when an insurer breaches its duty of good faith by *intentionally* refusing to satisfy an insured's claim . . . ."). Plaintiffs do not allege the bad faith performance of any contractual duty. Plaintiffs instead appear to use "bad faith" as a standard of misconduct in excess of negligence; not as a stand-alone claim. Therefore, I dismiss Count VIII as a separate cause of action.

7

must show that the alleged deprivation was committed by a person acting under color of state law."); *see also Abessolo v. Smith*, 2012 WL 668773, at *7 (S.D. Ohio Feb. 29, 2012) (R. & R.) ("Although [the foster parents] are not cloaked with immunity, neither can they be held liable for damages under § 1983 because they are private individuals and not State actors subject to suit.").

The principal inquiry is whether Nix's conduct may be "fairly attributable to the state," as opposed to her own private conduct. *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). The Supreme Court has developed three tests to determine whether a defendant was a state actor: (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. *Id.* (collecting cases).

*First*, under the public function test, a defendant is a state actor where she "exercise[s] powers which are traditionally exclusively reserved to the state." Several courts have held that foster care is not a power that traditionally the state alone can exercise. *See, e.g., Lintz v. Skipski*, 807 F. Supp. 1299, 1306 (W.D. Mich. 1992) ("[T]he care of foster children is not a power which has been exclusively reserved to the state."); *Brow v. Hatch*, 984 F. Supp. 2d 700, 708 (E.D. Mich. 2013) ("While removing a child from her home and placing her with other caregivers are arguable exclusive governmental functions . . . the day-to day provision of foster care is not."); *Milburn v. Anne Arundel Cty. Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir. 1989) ("The care of foster children is not traditionally the exclusive prerogative of the State."); *Leshko v. Servis*, 423 F.3d 337, 343 (3rd Cir. 2005) ("No aspect of providing care to foster children . . . has ever been the exclusive province of the government.").

Here, Defendant Nix provided for and controlled Q.C.W.'s foster care under a license and agreement to do so. Nix's day-to-day foster care is not an exclusive government function. Plaintiffs point to no authority to the contrary.

*Second*, under the state compulsion test, the state must "exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Wolotsky, supra*, 960 F.2d at 1335. This requires more than mere acquiescence to the plan and actions of the private party. *Id.*

Plaintiffs have not alleged or argued that LCCS coercively controlled Nix's day-to-day tasks as a foster parent in a way that would make Nix's parenting decisions state action.

*Third*, under the symbiotic relationship or nexus test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Id.* The fact that the state regulates foster care does not, by itself, convert a foster parent's actions into state action. *See id.* Rather, a plaintiff's allegations must show that the state is "intimately involved" in the challenged conduct. *See id.*

Plaintiffs rely on a District of New Mexico case, *Faulkner v. New Mexico Children, Youth & Families Department*, 2016 WL 10588127 (D.N.M. Mar. 7, 2016). (Doc. 17, pgID 551). *Faulkner* applied the symbiotic relationship or nexus test and determined that New Mexico foster parents are state actors under New Mexico law. *See id.* at *6. The *Faulkner* court found significant the fact that New Mexico considered foster parents "public employees." *Id.* at *5. The court also noted that, under New Mexico law, "the foster parent cooperates with and carries out the state's plans, with the state controlling the day-to-day parenting in foster homes." *Id.*

The elements in *Faulkner* are not present in this case. Plaintiffs do not allege facts or argue controlling authority that plausibly shows Nix is a "public employee" or that LCCS controlled Nix's day-to-day operations.

Plaintiffs cite an Ohio Attorney General opinion from 1987 to argue that Nix is an LCCS employee. Ohio Op. Att'y Gen. No. 87-082 (Oct. 30, 1987). This opinion is not persuasive or conclusive. The opinion analyzed whether a county government could be liable for a tort committed by a child in foster care through an agency theory—not whether foster parents are state agents for § 1983 purposes. *Id.* at *17.

The attorney general could not conclude whether a foster parent was a public employee in that circumstance. He did, however, opine: "It appears . . . that foster parents act as independent contractors and not as agents of the county in carrying out their responsibilities . . . ." *Id.* at *8.

The attorney general also said that whether a foster parent is a county employee is "a question of fact." *Id.* at *13. But he was not discussing pleadings standards or summary judgment; he was only stating that Ohio law did not give him authority to decide or offer his opinion on questions of fact. *Id.* The attorney general could not determine, based on the hypothetical question and advisory request to him, "whether or not [an] employer has a right of control over the manner of the work to be performed." *Id.* at *9.

Plaintiffs cannot rest, however, on the limits of the attorney general's authority. Plaintiff must plead facts plausibly showing that LCCS controlled Nix's day-to-day work as a foster parent. *Iqbal*, 556 U.S. at 682. They have not. Therefore, I conclude that Defendant Rochelle Nix is not a state actor against whom Plaintiffs can maintain a § 1983 action.

### 2.      Procedural Due Process Violations

Plaintiffs allege that Defendant LCCS and its employees violated their procedural due process rights by failing to provide notice of the shelter care removal proceedings for Q.C.W. The LCCS Defendants respond that they are absolutely immune from this claim.

10

The Fourteenth Amendment states in part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amen. XIV, § 1. This right has a procedural and a substantive component. *Golf Vill. N., LLC v. City of Powell, Ohio*, 42 F.4th 593, 598 (6th Cir. 2022). The former ensures adequate procedural safeguards, and the later protects against government action that "shocks the conscience" regardless of the procedure in place. *Eidson v. State of Tenn. Dep't of Child.'s Servs.*, 510 F.3d 631, 635 (6th Cir. 2007).

Procedural due process generally requires that the government provide notice and an opportunity to be heard before depriving a person of liberty or property. *Warren v. City of Athens, Ohio*, 411 F.3d 697, 708 (6th Cir. 2005). To state a claim, a plaintiff must sufficiently allege (1) the deprivation of a protected liberty or property interest and (2) that the deprivation occurred without adequate procedural safeguards. *Lipman v. Budish*, 974 F.3d 726, 751 (6th Cir. 2020).

Plaintiffs have a recognized fundamental liberty interest in the "care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). Therefore, the claim here turns on whether the Defendants deprived them of that right by not providing notice of and an opportunity to be heard at the shelter care hearings.

Plaintiffs or their counsel attended all of the shelter care hearings for Q.C.W., and therefore necessarily had notice, except for one: the initial *ex parte* shelter care hearing on November 20, 2019. But Defendants have "no independent duty to inform [Plaintiffs] about developments in the juvenile court proceedings or relevant court dates." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 730 (6th Cir. 2011). Plaintiffs must show that each LCCS Defendant, "through [his or her] individual actions, has violated the Constitution." *Iqbal, supra*, 556 U.S. at 663. Rather, "it is the juvenile court's responsibility to ensure that

11

[Plaintiffs] received adequate notice of the custody proceedings." *Pittman, supra*, 640 F.3d at 730 (citing Ohio R. Juv. P. 15(A) and Ohio Rev. Code § 2151.29).

Further, Ohio law specifically allows for such an *ex parte* proceeding—literally, "from one party"—provided that a contested hearing that includes notice and an opportunity to be heard occurs within 72 hours after the *ex parte* order is issued. Ohio Rev. Code § 2151.33; *see also Young v. Vega*, 574 F. App'x 684, 686, 692 (6th Cir. 2014) (likening "*ex parte* orders taking emergency temporary custody of the children pending a preliminary hearing" to a judicially approved arrest warrant).

That is exactly what happened here. The Ohio juvenile court found that LCCS made reasonable efforts to let the Plaintiffs know about the *ex parte* hearing. The Court then held a full hearing the day after entering the *ex parte* order. The full hearing included Plaintiffs and their counsel.

I therefore find that Plaintiffs have failed to adequately state a procedural due process claim.

### 3.     Substantive Due Process Violations

Plaintiffs allege two violations of their substantive due process rights. *First*, they allege that the LCCS Defendants unconstitutionally interfered with their fundamental rights in the "care, custody, and control of their children" when the shelter care order removed Q.C.W. from

12

their custody. *Second*, Plaintiffs allege that the LCCS Defendants and Defendant Nix were deliberately indifferent to Q.C.W.'s risk of serious harm.[3]

### a.    Interference with Right to Parent

Plaintiffs claim the LCCS Defendants deprived them of their substantive right to parent Q.C.W. when they removed him from Plaintiff Redmond's custody. Plaintiffs also claim that LCCS employees' false statements to the juvenile court violated this right. (Doc. 1, ¶¶ 51–52, 208). Defendants argue that it is the juvenile court, not LCCS, that has the authority to remove and place children and that regardless, Defendants are immune from liability.

To state a substantive due process claim, a plaintiff must sufficiently allege "conduct intended to injure in some way unjustifiable by any government interest and that is conscience-shocking in nature." *Eidson v. State of Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (internal quotation marks omitted).[4]

As discussed, Plaintiffs have a constitutionally protected interest in the "care, custody, and control of their children. *Troxel, supra*, 530 U.S. at 66. But "[t]he government's interest in

---

[3] Plaintiffs' claims against the LCCS Defendants in their official capacity fail because Plaintiffs have not established that a policy or custom of LCCS was the "moving force" behind the alleged constitutional violations. *Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658, 694. They have not "identif[ied] the policy, connect[ed] the policy to the [county] itself and show[ed] that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

[4] In the legislative context, courts apply the scrutiny test for such a deprivation. But the substantive due process claims here concern Defendant's alleged actions and inactions as an executive function. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("[C]riteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue."); *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 462 n.2 (7th Cir. 2007) ("When, as in the present case, a plaintiff complains of abusive executive action, this 'conscience shocking' test determines liability, rather than the traditional strict scrutiny standard used to measure the constitutionality of legislative acts.").

protecting children is just as compelling as the parents' abstract fundamental liberty interest in family integrity. *Eidson, supra*, 510 F.3d at 636; *accord In re C.F.*, 862 N.E.2d 816, 821 (Ohio 2007) ("[G]overnment has broad authority to intervene to protect children from abuse and neglect.").

Here, the Ohio juvenile court made several findings in its order removing Q.C.W. from Plaintiff Redmond's custody, including: (1) that there were reasonable grounds to believe Q.C.W. was in danger and that continued custody with Redmond would be contrary to Q.C.W.'s best interests and welfare; (2) that Redmond had a current open case with LCCS regarding the safety and custody of her first son; and (3) that Plaintiff Whitsell had a criminal history, including a history of domestic violence between Redmond and him.

Just as the Sixth Circuit similarly concluded in *Eidson*, I conclude as a matter of law that "the juvenile court's finding of [reasonable grounds] to remove plaintiff's [child] is supported by a compelling interest and does not, on its face, suggest government over-reaching that 'shocks the conscience.'" *Id.*

Further, the LCCS Defendants did not have the authority to make any decisions regarding Q.C.W.'s custody. That decision rested with the juvenile court only. The Sixth Circuit has explained this relationship between the Ohio courts and the county children services departments:

> [T]he juvenile court decides whether to grant permanent custody to [children services] or to grant legal custody to a relative. *See* Ohio Rev. Code Ann. §§ 2151.353(A)(3), 2151.414(A)(1). Similarly, though a [children services] caseworker makes an initial determination as to the appropriate placement for a child in [children services] custody, that determination is not binding on interested parties, including the parents, until the juvenile court approves and journalizes the child's case plan; if a parent disagrees with the [children services] case plan, his recourse is with the juvenile court, which will hear "evidence on the contents of the case plan" and, "based upon [that] evidence . . . and the best interest of the child, shall determine the contents of the case plan." *Id.* § 2151.412(D). In

14

contrast, [children services] is merely a party to the juvenile court proceedings, tasked with presenting to the juvenile court its recommendation as to the appropriate course of action in a particular case. *Because the juvenile court has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive [Plaintiff] of his fundamental right.*

*Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 729 (6th Cir. 2011) (emphasis added). Thus, Plaintiffs may fault only the family court, not LCCS, for a deprivation of their right to parent due to Q.C.W.'s removal from their custody. *See Barber v. Miller*, 809 F.3d 840, 848 (6th Cir. 2015); *see also Iqbal, supra*, 556 U.S. at 663 (requiring liability based on a defendant's "own individual actions"—not the actions of others).

Plaintiffs also allege that, during the shelter care hearing, LCCS Defendant Nicholas Good made deceptive and false statements to the juvenile court. Regardless of that allegation's plausibility, social workers, in their capacity as advocates before the court, have absolute immunity. *See Hancock v. Miller*, 852 F. App'x 914, 923–24 (6th Cir. 2021) ("[S]ocial workers have absolute immunity for filing petitions with the court—even ones with false statements or ones filed for improper reasons."). To the extent Plaintiffs claim that LCCS's initiating and prosecuting the shelter care proceedings violated due process, the LCCS Defendants are immune for the same reason.[5]

Therefore, Plaintiffs have failed to adequately plead plausible substantive due process claims based on Q.C.W.'s removal from their custody.

---

[5] The Complaint also alleges that the LCCS Defendants deprived Plaintiff Redmond of her right to parent when they removed her other two children, J.D.C. and Q.W. (not the "Q.W." referenced in the case caption), from her custody. (Doc. 1, ¶¶ 23–34; 168–80). To the extent Plaintiffs base premise claims on J.D.C. and Q.W.'s removal, the same immunity applies.

### b.     Deliberate Indifference

Plaintiffs claim that the LCCS Defendants and Defendant Nix violated Q.C.W.'s

constitutional rights by "disregarding Q.C.W.'s health and wellbeing after placing him with

Defendant Rochelle Nix and not monitoring and following up to ensure that Plaintiff's worries,

concerns, and protests related to Q.C.W.'s failure to thrive were not of concern." (Doc. 17, pgID

549; Doc. 1, ¶¶ 54–55). Plaintiffs also allege that Q.C.W. "had a constitutional right to be free

from the infliction of unnecessary harm" while in the custody of the LCCS Defendants. (Doc. 1,

¶ 211). Put in its § 1983 context, this appears to be a Fourteenth Amendment claim for deliberate

indifference.[6] Defendants contend that Plaintiffs' allegations do not make out a plausible claim.

Generally, the Constitution does not protect citizens against the actions of private

persons. *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 366 (6th Cir. 2012). One exception

to this rule covers certain government-created "special relationships" with private persons that

may give rise to an affirmative state duty under the Constitution. *Id.* The relationship between

government child services agencies and children in foster care is such a "special relationship."

*Meador v. Cabinet for Hum. Res.*, 902 F.2d 474, 476 (6th Cir. 1990) ("We hold that due process

extends the right to be free from the infliction of unnecessary harm to children in state-regulated

foster homes."); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 201

n.9 (1989).

The Sixth Circuit applies the "deliberate indifference" standard to claims that a

government official violated their duty to protect a child in foster care. *Moore v. Lake Cnty.*

*Dep't of Job & Fam. Servs.*, 364 F. App'x 194, 196 (6th Cir. 2010); *Lintz v. Skipski*, 25 F.3d 304,

---

[6] Plaintiff Redmond, as administrator of Q.C.W.'s estate, can maintain the deliberate indifference
claim on Q.C.W.'s behalf. *See Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984).

306 (6th Cir. 1994). To state a Fourteenth Amendment claim for deliberate indifference, a Plaintiff must allege that the government officials "knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights." *Guertin v. State*, 912 F.3d 907, 926 (6th Cir. 2019) (internal quotation marks omitted).

Deliberate indifference is more than just negligence and is akin to subjective recklessness. *R.S. ex rel. V.H. v. Lucas Cnty. Child. Servs.*, 2022 WL 17730531, at *5 (6th Cir. Dec. 16, 2022). Plaintiffs must show that Defendants "knew of and disregarded a substantial risk of serious harm" to Q.C.W.'s health and safety. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). A plaintiff can allege this knowledge through circumstantial facts, "showing that the risk was so obvious that the official had to have known about it." *Id.*

Plaintiffs' nonconclusory factual allegations here do not state a plausible claim of deliberate indifference against the LCCS Defendants. Plaintiffs claim that Q.C.W. was uniquely susceptible to serious harm because he was a "medically fragile" or a "failure to thrive" child. (Doc. 1, ¶¶ 55–56). Alone, these labels are legal and medical terms of art and therefore conclusory. *Twombly, supra*, 550 U.S. 544, 555 ("[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions . . . .).

"Failure to thrive" is a medical diagnosis that may be "based upon an objective finding that a child's weight falls below the third percentile of weight of children of like age. *See B.S. v. Somerset Cnty.*, 704 F.3d 250, 253 (3d Cir. 2013) (quoting a medical encyclopedia available through the National Institutes of Health). Plaintiffs do not allege that a medical professional diagnosed Q.C.W. with a "failure to thrive." Plaintiffs' statements in their response brief regarding a failure to thrive are therefore conclusory.

17

Ohio regulations for children services define "medically fragile child" as "a person from birth through twenty-one years of age who has intensive health care needs that can be met in a medically fragile foster home." Ohio Admin. Code 5101:2-1-01(B)(194). Ohio law, in turn requires that medically fragile children be placed in a "medically fragile foster home" to receive daily, specialized care from medical professionals. Ohio Rev. Code § 5103.02(F); Ohio Admin. Code 5101:2-7-17.

LCCS did not determine Q.C.W. to be a medically fragile child. Plaintiffs' allegations that Q.C.W. qualified as such are conclusory. Plaintiffs do not allege any specific fact about Q.C.W.'s medical condition other than the general statement that he "had several medical issues." (Doc. 1, ¶ 55). Additionally, the only medical records properly before me show that in February 2020 (following the car accident), Q.C.W. did not have any cuts or bruises and that he was alert, oriented, and responding appropriately.

Plaintiffs maintain that discovery will allow them the opportunity to hire experts who can opine that Q.C.W. in fact met the children services regulations criteria for a medically fragile child and that LCCS erred by not realizing this. (Doc. 17, pgID 553). But the deliberate indifference standard requires that the Defendants had actual subjective knowledge at the time of the alleged conduct. *See R.S. ex rel. V.H., supra*, 2022 WL 17730531, at *5.

It is not enough that Defendants later learned, through discovery and the assistance of Plaintiffs' expert witnesses, that Q.C.W. was medically fragile and that they should have known so earlier. Plaintiff must allege facts and actual knowledge of Defendants at the time, and that Defendants inferred a substantial risk of serious harm from those facts.

Plaintiffs' allegations do not plausibly show facts from which Defendants could have inferred a substantial risk of serious harm—namely, Q.C.W.'s death due to SUID. Plaintiffs

18

allege several isolated instances where they brought issues to the attention of the various LCCS Defendants: that Q.C.W. was brought to a visit with Plaintiff without sufficient clothing or enough food (Doc. 1, ¶¶ 61, 67); that the nipple on a baby bottle was not big enough for a one-month-old child (*id.* ¶ 62); that Defendant Nix did not have a diaper bag (*id.* ¶ 66); and that Q.C.W. showed signs of a diaper rash and bleeding (*id.* ¶ 71). Plaintiffs do not allege or explain how, based on these complaints, Defendants inferred (not just *could have* inferred) a substantial or obvious risk of serious harm and neglect at the hands of Q.C.W.'s foster caretakers. *See Bukowski, supra*, 326 F.3d at 710.

Plaintiffs also alleged that the LCCS Defendants were deliberately indifferent when they failed to protect Q.C.W. after they learned of the February 21, 2020 car accident. (Doc. 1, ¶ 96–119). But the medical records to which Plaintiffs refer in their Complaint show that LCCS requested Nix to take Q.C.W. to the hospital to be evaluated the day after the accident. *See Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017) ("[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."). Nix did exactly as LCCS requested.

Plaintiffs do not allege that any of the LCCS Defendants had knowledge of Nix's failure to take Q.C.W. to a follow-up appointment the next week. Nor do Plaintiffs plausibly allege that Defendants inferred a substantial risk of serious harm due to a missed medical appointment.

Significantly, the injury at issue is sudden unexpected infant death while left unattended in a swing at Defendant Mikonowicz's daycare. Plaintiffs do not allege that any of the LCCS Defendants knew of that risk or of facts from which they could infer that risk. Therefore, Plaintiffs have failed to plead a plausible claim for deliberate indifference against the LCCS Defendants.

19

### 4.     Ohio State Constitution and State Statutory Violations

Plaintiff Redmond claims that the LCCS Defendants violated her rights under the due process clause of the Ohio Constitution. (Doc. 1, ¶¶ 192–203). The Supreme Court of Ohio has not recognized a private cause of action under the Ohio Constitution where that provision does not itself provide a civil remedy. *PDU, Inc. v. City of Cleveland*, 2003-Ohio-3671, ¶ 27 (8th Dist. Ct. App.) ("[B]ecause Sections 2, 11, and 16 of Article I [due process] of the Ohio Constitution are not self-executing provisions, they do not create independent causes of action."); *see also Provens v. Stark Cty. Bd. of Mental Retardation & Developmental Disabilities*, 594 N.E.2d 959, 965 (Ohio 1992); *Mango v. City of Columbus*, 2020 WL 5247939, at *7 (S.D. Ohio Sept. 3, 2020).

Plaintiffs also allege that the LCCS Defendants violated multiple statutory and regulatory duties. (Doc. 1, ¶¶ 218–37). These statutes and regulations include Ohio Revised Code § 2151.421, § 2919.22, § 5153.16, § 5153.171(A), and §5153.175; and Ohio Administrative Code § 5101:2-7-17, § 5101:2-13-09; § 5101:2-13-10, § 5101:2-13-23, § 5101:2-33-23, § 5101:2-36-03, and § 5101:2-36-20. But the statutes do not expressly create a private cause of action or impose civil liability for their violation, and Plaintiffs have not identified any authority to the contrary. Ohio Rev. Code § 2744.02(B)(5) ("Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon a political subdivision."); *see also Fawcett v. G. C. Murphy & Co.*, 348 N.E.2d 144, 147 (Ohio 1976) (requiring a "clear implication" by the General Assembly that it intended to create a private cause of action for breach of a statute.).

Therefore, Plaintiffs' have not pled legally plausible claims under the Ohio Constitution or the cited state statutes and regulations.

### 5.     Wrongful Death and Survival

Last, Plaintiffs claim that all Defendants are liable in tort for wrongful death and survival.
(Doc. 1, ¶¶ 238–85). Moving Defendants argue that they are entitled to statutory immunity on
Plaintiffs' state tort claims.

Under Ohio law, "[t]o maintain a wrongful death action on a theory of negligence, a
plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that
duty, and (3) proximate causation between the breach of duty and the death." *Est. of Ridley v.
Hamilton Cty. Bd. of Mental Retardation & Developmental Disabilities*, 809 N.E.2d 2, 6 (Ohio
2004). Plaintiffs also base their survival claim on tort negligence. *See Peters v. Columbus Steel
Castings Co.*, 873 N.E.2d 1258, 1261 (Ohio 2007).

### a.     Political Subdivision Statutory Immunity

A political subdivision like LCCS, and its employees, are "not liable in damages in a civil
action for injury, death, or loss to person or property allegedly caused by any act or omission of
the political subdivision or an employee of the political subdivision in connection with a
governmental or proprietary function," unless a statutory exception to this immunity applies.
Ohio Rev. Code Ann. §§ 2744.02–.03. A political subdivision employee is not immune where
"[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or
reckless manner[.]" *Id.* § 2744.03(A)(6)(b).

Plaintiffs first argue that the LCCS Defendants are not immune under Ohio Rev. Code
§ 2744.02(B)(5) because the legislature has expressly imposed liability by statute. (Doc. 17,
pgID 582–84). However, as discussed above, the Ohio legislature has not expressly created a
private cause of action under any of the statutes Plaintiffs cite. Therefore this exception to
statutory immunity does not apply.

Plaintiffs also argue that the LCCS Defendants do not have statutory immunity because they acted "with malicious purpose, in bad faith, or in a wanton or reckless manner," conduct exempt from immunity under Ohio Rev. Code § 2744.03(A)(6)(b).

Plaintiffs rely on *Sargent v. United Transp. Co.*, 381 N.E.2d 1331, 1334 (10th Dist. Ohio Ct. App. 1978) for the proposition that Defendants owed a heightened duty of care to Q.C.W. because of his young age. That case concerned an automobile driver's duty owed to children in the area. *Id.* The court reasoned that the duty owed to children near a roadway is higher than the duty owed to similarly placed adults because a "child of tender years" does not have "the same discernment and foresight in comprehending dangers" as does an adult. *Id.*

Even assuming a similar heightened duty applies to these facts, it does not relate to the culpability of the conduct. In other words, the level of "duty" is a separate element from the nature of the "breach." A defendant can breach a duty by acting negligently, recklessly, willfully, wantonly, maliciously, knowingly, intentionally, purposefully, or by any other adverb applied by the courts and General Assembly. The nature of the duty therefore does not inform *how* Defendants acted to breach that duty—which is the issue here.

To defeat statutory immunity, Plaintiffs must plead facts that plausibly show Defendants breached their duty of care in a malicious, bad faith, wanton, or reckless manner.

Ohio defines malicious conduct in the immunity context as "the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *FRC Project, L.L.C. v. Canepa Media Sols., Inc.*, 2013-Ohio-259, ¶ 10 (8th Dist. Ct. App.).

Bad faith requires a similar intentionality and is a "dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive or ill will." *Morrison v. Horseshoe Casino*, 157 N.E.3d 406, 431 (8th Dist. Ohio Ct. App. 2020).

The standard for wanton misconduct is likewise "high" and requires the showing of a "failure to exercise any care whatsoever." *Fabrey v. McDonald Vill. Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994).

Finally, reckless conduct is "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012).

Plaintiffs have not alleged conduct that plausibly shows any of the above. Plaintiffs allege that the LCCS Defendants failed to train or supervise Defendant Nix properly. (Doc. 1, 276–85). Plaintiffs also allege Defendants failed to investigate properly Plaintiffs' concerns about Q.C.W.'s care and to protect Q.C.W. from harm while in LCCS custody.

The Complaint includes the legal labels of "willful, wanton, and reckless" throughout. (*See, e.g.*, Doc. 1, ¶¶ 6, 91, 142, 157, 181). But these labels and formulaic recitations of the elements, without "further factual enhancement," are not enough. *Iqbal*, 556 U.S. at 678.

The Complaint does not contain any factual enhancement beyond the labels and the basic allegation that LCCS failed to train, supervise, and investigate. The factual allegations do not show, and Plaintiffs do not argue, how the alleged conduct could plausibly have been done with the intent to injure Q.C.W., without any care whatsoever, or with indifference to an obvious risk of harm to him.

Therefore, I find that statutory immunity to Plaintiffs' state law claims applies to all of the LCCS Defendants as the political subdivision and its employees.

23

### b.  Foster Parent Statutory Immunity

Defendant Nix is not an LCCS employee and does not have immunity under the same statutes. But Ohio law provides separately for a foster parent's immunity from liability. "[A] foster caregiver shall be immune from liability in a civil action to recover damages for injury, death, or loss to person or property allegedly caused by an act or omission in connection with a power, duty, responsibility, or authorization under [the child placement statutes]." Ohio Rev. Code § 5103.162(A).

As with political subdivision immunity, exceptions apply. Relevantly, a foster caregiver is not immune for acts done with a "malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.* § 5103.162(B)(2). I apply the same definitions as above for malicious, bad faith, wanton, and reckless conduct.

Plaintiffs' allegations plausibly show that Defendant Nix acted negligently. Nix knew that Q.C.W. was involved in a car accident, and she took him to the emergency room for medical treatment the day after. The medical providers did not detect or diagnose any injury, but they advised Nix to schedule a follow-up appointment for the following week with Q.C.W.'s primary care provider. Nix did not do so.

This omission raises a plausible claim for negligence. However, as a foster parent, Nix is immune from liability for negligent conduct. Ohio Rev. Code § 5103.162(A). Plaintiffs must instead allege, and support with factual allegations, that Nix's conduct was malicious, in bad faith, wanton, or reckless. *Id.* § 5103.162(B)(2).

*First*, regarding malicious and bad faith conduct, Plaintiffs nowhere allege how Nix intended to injure Q.C.W., beyond reciting the conclusory labels.

24

*Second*, regarding wanton conduct, Plaintiffs allegations do not plausibly show that Nix failed to exercise any care whatsoever. In fact, the allegations show that Nix took Q.C.W. to the emergency room the day after the car accident to be evaluated. The medical providers did not find any injury, found no evidence of cuts or bruising, and noted that Q.C.W. was alert. Nix also scheduled a primary care appointment for Q.C.W. a few weeks after the car accident.

Nix's alleged care may have plausibly fallen below the negligence standard, but it was still care. *See Fabrey, supra*, 639 N.E.2d at 35 ("[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.").

*Third*, regarding reckless conduct, Plaintiffs do not plausibly allege how Nix acted indifferently to an obvious risk to Q.C.W. To the contrary, both the emergency room record and the coroner's report referenced in the Complaint do not identify any injury. Trained medical professionals failed to perceive or note any obvious risk to Q.C.W., and Plaintiffs do not allege how Nix plausibly could have done so.

Plaintiffs have not adequately alleged an exception to the statutory immunity Nix possesses as a foster caregiver. Therefore, I find that statutory immunity applies to the state law claims against Defendant Nix.

## Conclusion

The loss of any child, regardless of the circumstances, is a tragedy. And the pain to the child's surviving parents and family is truly heartbreaking. It is my hope that Ms. Redmond and Mr. Whitsell find relief and comfort for the unimaginable loss of their son, Q.C.W. Unfortunately, I cannot afford that relief against the moving defendants under federal or Ohio law. I dismiss the claims against LCCS and Rochelle Nix.

It is, therefore,

ORDERED THAT:

1. Defendants Lucas County Children Services, Robin Reese, Katrina Jones, Nicholas, Good, Danielle Stroble, Donna Brown, and Laura Rubley's Motion for Judgment on the Pleadings (Doc. 10) be, and the same hereby is, granted.

2. Defendant Rochelle Nix's Motion for Judgment on the Pleadings (Doc. 13) be, and the same hereby is, granted.

3. Counts I, II, III, IV, VII, and VIII of Plaintiffs' Complaint (Doc. 1) be, and the same hereby are, dismissed in their entirety.

4. Counts V, VI, and IX of Plaintiffs' Complaint (Doc. 1) be, and the same hereby are, dismissed only as to Defendants Lucas County Children Services, Robin Reese, Katrina Jones, Nicholas, Good, Danielle Stroble, Donna Brown, Laura Rubley, and Rochelle Nix.

5. The claims against Defendant Dana Mikonowicz and John/Jane Doe agents of Dana Mikonowicz in Counts V, VI, IX remain pending. Under 28 U.S.C. § 1367, I continue to exercise supplemental jurisdiction over these remaining claims.

6. The Clerk shall forthwith schedule a status/scheduling conference.

SO ORDERED.

/s/ James G. Carr
Sr. U.S. District Judge

26